**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ARTHUR ANDERSON and MANUEL RIVERA, individually and as representatives of a class of similarly situated persons, and on behalf of SOUTHWEST AIRLINES, CO. RETIREMENT SAVINGS PLAN, THE SOUTHWEST AIRLINES CO. 401(k) PLAN, and the SOUTHWEST AIRLINES CO. PROFITSHARING PLAN,<br><br>PLAINTIFFS,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., THE BOARD OF DIRECTORS OF SOUTHWEST AIRLINES CO., SOUTHWEST AIRLINES CO. RETIREMENT SAVINGS PLAN COMMITTEE, THE SOUTHWEST AIRLINES CO. PROFITSHARING/401(k) COMMITTEE, LORI WINTERS, and DOES 1-40.<br><br>DEFENDANTS. | § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.:<br><br><br>**COMPLAINT – CLASS ACTION** |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

1.      Plaintiffs Arthur Anderson and Manuel Rivera ("Plaintiffs"), by and through their attorneys, on behalf of the Southwest Airlines Co. Retirement Savings Plan, the Southwest Airlines Co. 401(k) Plan, and the Southwest Airlines Co. ProfitSharing Plan (collectively, the "Savings Plan" or "the Plan"), themselves, and all others similarly situated, state and allege as follows:

### I.      INTRODUCTION

2.      Plaintiffs Arthur Anderson and Manuel Rivera bring this action under 29 U.S.C. § 1132(a)(2) on behalf of the Plan and the Plan's participants and beneficiaries against Defendants Southwest Airlines Co. ("Southwest Airlines"); the Southwest Airlines Co. Retirement Savings Plan Committee and the Southwest Airlines Co. ProfitSharing/401(k) Committee (collectively, the

"Plan Committee"); the Plan Committee's members; the Southwest Airlines Board of Directors; and members of the Board of Directors (collectively, "Defendants," "Southwest," or "Southwest Defendants") for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").

3.      The Southwest Defendants are fiduciaries to the Savings Plan.

4.      As fiduciaries, the Southwest Defendants have an obligation to prudently curate a menu of investment options for the Savings Plan. They must regularly monitor those investment options and remove ones that become imprudent. The Plan's participants, who are mostly current and former Southwest employees, can invest their retirement savings in any of the funds that the Southwest Defendants select for the Plan.

5.      On or before 2010, the Plan Committee selected the Harbor Capital Appreciation Fund as an investment option for the Plan. The Committee first selected a mutual fund version of the fund and later migrated the assets to a collective investment trust (collectively, the "Harbor Fund" or the "Fund"). The Committee has retained the Fund, whether organized as a mutual fund or collective investment trust, for at least fifteen years.

6.      The Harbor Fund is a large-cap growth strategy managed by the large-cap growth investment team at Jennison Associates. Morningstar, Inc. ("Morningstar")[1] classifies the Harbor Fund as a large-cap growth fund.

7.      Large-cap growth funds typically pursue a strategy of investing in the stock of large companies with high growth potential. They are a popular category of investment. As a result, the

---

[1] Morningstar is the leading provider of independent investment research products (e.g., data and research insights on managed investment products, publicly listed companies, and private capital markets) for individual investors, financial advisors, asset managers, retirement plan providers and sponsors, and institutional investors in the private capital markets in North America, Europe, Australia, and Asia.

Plan's fiduciaries had (and have) hundreds of different large-cap growth funds to choose from when selecting investment options for the Plan. Yet, for over a decade, the Harbor Fund has been the only large-cap option Defendants have made available to the Plan's participants.

8.      The Harbor Fund is an "actively managed" fund. The investment advisers of active funds charge investors fees on the premise that they will pick investments that outperform a market benchmark. Accordingly, if an investment adviser of an actively managed fund cannot beat or at least match its benchmark, then it has failed to meet the primary objective for which it was hired. "Passive funds," by contrast, replicate the investment holdings of those market benchmarks; they are designed to match (but not beat) benchmarks. They therefore require less effort to manage than actively managed funds and carry far lower fees.

9.      The Harbor Fund failed its primary objective: it could not beat its benchmark. By December 31, 2018, the cumulative investment performance of the Harbor Fund had lagged its designated benchmark—the Russell 1000 Growth Index[2]—*over the preceding three-, five-, and nine-year periods*. Moreover, the Fund also underperformed other large-cap growth alternatives over the same three-, five-, and nine-year stretches. Faced with the Fund's long-term poor performance, a prudent fiduciary would have removed the Fund well before but not later than January 2019.

10.     Yet, Southwest took no action. It continued to include the Harbor Fund in the Plan's lineup despite a market teeming with hundreds of large-cap growth alternatives. Some of these

---

[2] The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

alternatives clearly offered participants better value for their money. For example, the Vanguard Russell 1000 Growth Index Fund not only performed better than the Habor Fund, but it also charged participants a significantly lower fee.

11.     The Harbor Fund's poor performance continued through the Class Period, which commences January 28, 2019, and continues through the date of judgment.

12.     The results have been disastrous for Plan participants. As of December 31, 2023, Plan participants had invested about $2.3 billion of their retirements savings in the Harbor Fund. Overall, about 17 percent of all Plan assets were invested in the Fund. As described in Section VIII, by failing to remove the Harbor Fund, Defendants caused participants to lose millions of dollars in retirement savings since the start of the Class Period.

13.     As fiduciaries of the Plan, Defendants are duty-bound to monitor the Plan's investments and protect participants from these flagrant blow-ups by removing them from the Plan's investment lineup. Yet Defendants repeatedly refused to remove the Harbor Fund despite more than fifteen years of poor performance. A prudent fiduciary would have removed the Fund well before but not later than the start of the Class Period, and certainly during the ensuing years of poor performance throughout the Class Period. Defendants' conduct has not been prudent.

14.     The Southwest Airlines Co. Retirement Savings Plan is a merged plan. It contains the assets of the Southwest Airlines Co. 401(k) Plan and Southwest Airlines Co. ProfitSharing Plan. Specifically, effective May 31, 2024, Southwest transferred and merged the net assets of the ProfitSharing Plan into the 401(k) Plan. At that time, Southwest renamed the 401(k) Plan as the Southwest Airlines Co. Retirement Savings Plan. Plaintiffs bring their claims on behalf of each of the 401(k) Plan, the ProfitSharing Plan, and the Southwest Airlines Co. Retirement Savings Plan. Upon information and belief, Southwest Defendants jointly managed the 401(k) Plan and

ProfitSharing Plan prior to their merger. Accordingly, throughout this Complaint, the terms "Plan" or "Savings Plan" refer collectively to the merged plan and the predecessor 401(k) and ProfitSharing Plans.

15. To remedy Southwest's breach of fiduciary duty, Plaintiffs bring this action on behalf of the Plan, its participants, and their beneficiaries under 29 U.S.C. § 1132(a)(2) to enforce the Southwest Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty occurring during the Class Period. In addition, Plaintiffs seek such other Plan-wide equitable or remedial relief for the Plan as the Court may deem appropriate.

16. Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of the Plan's investment performance relative to other available investment alternatives) necessary to understand that the Southwest Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before filing this Complaint. Further, Plaintiffs do not have actual knowledge of the specifics of the Southwest Defendants' decision-making processes with respect to the Plan, including the Southwest Defendants' processes for monitoring and removing Plan investments, because this information is solely within the possession of the Southwest Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

## II.    PARTIES

### A.    Plaintiffs

17. Plaintiff Arthur Anderson brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate

Plan-wide relief under 29 U.S.C § 1109 to protect the interests of the Plan. Plaintiff Anderson is a participant, as defined in 29 U.S.C. § 1002(7), in the Southwest Airlines Co. Retirement Savings Plan, and he was a participant in the predecessor ProfitSharing and 401(k) Plans during the Class Period. Plaintiff Anderson suffered individual injury by investing in the Harbor Fund.

18.     Plaintiff Manuel Rivera brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C § 1109 to protect the interests of the Plan. Plaintiff Rivera is a participant, as defined in 29 U.S.C. § 1002(7), in the Southwest Airlines Co. Retirement Savings Plan, and he was a participant in the predecessor ProfitSharing and 401(k) Plans during the Class Period. Plaintiff Rivera suffered individual injury by investing in the Harbor Fund.

**B.    Defendants**

19.     Defendant Southwest Airlines is headquartered in Dallas, Texas, and is a major U.S. airline. Southwest Airlines is the Plan sponsor. Southwest Airlines acts through its Board of Directors.

20.     Defendant Board of Directors of Southwest Airlines Co. ("Board of Directors") is responsible for appointing and monitoring the Plan Committee, which administers and manages the Plan. The Plan Committee serves at the pleasure of the Board of Directors.

21.     Defendant Southwest Airlines Co. Retirement Savings Plan Committee is the named fiduciary of the Southwest Airlines Co. Retirement Savings Plan and manages the operation and administration of the Plan. Members of the Committee are appointed by the Board of Directors of Southwest Airlines. Current and former members of the Committee are fiduciaries of the Savings Plan under 29 U.S.C. § 1002(21)(A) because they exercise discretionary authority and/or discretionary control respecting management of the Plan.

22.    Defendant Southwest Airlines Co. ProfitSharing/401(k) Committee was a fiduciary of the Southwest Airlines Co. 401(k) Plan and Southwest Airlines Co. ProfitSharing Plan. Upon information and belief, it jointly managed the operation and administration of both plans. Members of the Committee were appointed by the Board of Directors of Southwest Airlines. Current and former members of the Committee were fiduciaries of the Savings Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting management of the Plan. Upon information and belief, the Southwest Airlines Co. ProfitSharing/401(k) Committee became the Southwest Airlines Co. Retirement Savings Plan Committee following the merger that created the Southwest Airlines Co. Retirement Savings Plan. Accordingly, throughout this Complaint, the term "Plan Committee" refers collectively to the Southwest Airlines Co. ProfitSharing/401(k) Committee and the Southwest Airlines Co. Retirement Savings Plan Committee.

23.    Defendant Lori Winters was a member of the Plan Committee and fiduciary of the Plan as of May 31, 2024.

24.    Plaintiffs are currently unaware of the identities of the other individual members of the Plan Committee during the Class Period. Accordingly, those individuals are collectively named Defendants Does 1-20. Further, Plaintiffs are not currently aware of the identities of the members of the Board of Directors to whom the board delegated responsibility for the Plan Committee and the Plan. Accordingly, those individuals are named Defendants Does 21-40. Plaintiffs will substitute the real names of the Does when they become known to Plaintiffs. To the extent the Defendants delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiffs, the person or entity to which the function was

delegated is also a fiduciary under 29 U.S.C. § 1002(21)(A) and thus alleged to be a Doe Defendant.

## III.    JURISDICTION, VENUE, AND STANDING

25.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

26.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which the Southwest Defendants reside.

27.    As participants in the Plan and holders of the Harbor Fund, Plaintiffs have standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2), and they are participants seeking appropriate Plan-wide relief under 29 U.S.C. § 1109. Thus, Plaintiffs bring this suit under § 1132(a)(2) in a representative capacity on behalf of the Plan as a whole and seek remedies under § 1109 to protect the Plan.

## IV.    ERISA'S FIDUCIARY STANDARDS

### A.    Overview of ERISA's Fiduciary Duty of Prudence

28.    ERISA's fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (internal quotation marks omitted). ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Accordingly, even in a defined contribution plan in which participants choose their investments, plan fiduciaries must conduct their own independent

evaluation to determine which investments may be prudently included in the plan's menu of options. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).

29.    As part of its fiduciary duty, Southwest "has a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). That "continuing duty" exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Id.* "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, Southwest "must dispose of it within a reasonable time." *Id.* (citation omitted).

## B.    Fiduciary Liability Under ERISA

30.    Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to *such plan* any losses to the plan resulting from each such breach, and to restore to *such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

31.    29 U.S.C. § 1132(a)(2) is the enforcement mechanism of 29 U.S.C. § 1109. It enables participants and beneficiaries to bring civil actions to seek appropriate relief under 29 U.S.C. § 1109.

C.    **Co-Fiduciary Liability**

32.    ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary if:

  i.    he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

  ii.    by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

  iii.    he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## V.    THE PLAN

33.    The Southwest Airlines Co. Retirement Savings Plan is a profit-sharing plan as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) (hereinafter denoted as "the Code") and is subject to the provisions of ERISA. The plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a). Southwest Airlines is the sponsor of the plan.

34.    The Southwest Airlines Co. Retirement Savings Plan is a merged plan. It is comprised of the assets of what were formerly called the Southwest Airlines Co. 401(k) Plan (the "401(k) Plan") and the Southwest Airlines Co. ProfitSharing Plan (the "ProfitSharing Plan"). Both of those plans were defined contribution plans as described in Section 401(k) of the Code and were subject to the provisions of ERISA. The plans were established and maintained under a written document in accordance with 29 U.S.C. § 1102(a).

10

35.     Effective May 31, 2024, the net assets of the ProfitSharing Plan transferred and merged into the 401(k) Plan. At that time, the 401(k) Plan was renamed the Southwest Airlines Co. Retirement Savings Plan.

36.     Upon information and belief, Southwest Defendants jointly managed the 401(k) Plan and ProfitSharing Plan prior to their merger.

37.     The terms "Plan" or "Savings Plan," as used throughout this Complaint, refer collectively to the merged plan and the predecessor 401(k) and ProfitSharing Plans.

38.     During the Class Period, the Plan provided for retirement income for approximately 75,000 Southwest Airlines employees, former employees, and their beneficiaries (the "Plan participants"). Defendants exclusively controlled the selection and retention of the Plan's investment options. Participants' retirement account balances primarily depended on contributions they made to their accounts, Southwest Airlines' matching contributions, and the performance (net of fees and expenses) of the Plan's investment options.

39.     As of December 31, 2023, Plan participants had invested over $9 billion in the 401(k) Plan and over $5 billion in the ProfitSharing Plan. Approximately $1.7 billion in the 401(k) Plan—or about 17%—was invested in the Harbor Fund. About $600 million in the ProfitSharing Plan—or about 12%—was also invested in the Harbor Fund.

## VI.     OVERVIEW OF INVESTMENT FUNDS

40.     An investment fund (or mutual fund) is a pool of money contributed by a group of investors with similar investment objectives. The investment adviser takes this pool of money and invests in different stocks on behalf of all investors in the fund. The investment adviser manages the investments in each fund in accordance with the investment objectives and strategies set forth

in each fund's investment guidelines. For providing this service, the investment adviser charges the fund an investment advisory fee.

## A. Active vs. Passive Management

41.    The Harbor Fund is an actively managed fund—that is, a fund that relies on the professional judgment of its investment adviser to make decisions about the fund's portfolio of investments. For the Harbor Fund, Jennison's Large Cap Growth Team decides which industries they wish to allocate assets to, as well as what stocks to buy and sell and when. The Harbor Fund pays Jennison a fee for these services—a fee which the Harbor Fund passes on to investors, including the Plan's participants. Jennison's primary focus should be to outperform the benchmark it selected for the Fund: the Russell 1000 Growth Index. Indeed, Jennison charges fees for active management on the premise that it can pick a mix of stocks that beat the benchmark.

42.    Active managers run the risk that their methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim. This could cause the fund to lag its benchmark. Market research suggests the vast majority of active managers fail to beat their benchmarks. Given that active managers are paid to beat their benchmark, chronic underperformance is a red flag that suggests investors are not getting their money's worth and should consider other investment options.

43.    Investment research and analysis typically drive the investment decisions of actively managed funds. Factors that an investment adviser may consider include, but are not limited to, market trends, a company's financial condition, perceived risk of investing in the company, industry and sector outlook, and the underlying stock's performances in various market conditions. Based on their respective professional judgment, one investment adviser may like

consumer stocks while another may like technology stocks, while a third may like stocks whose issuers focus on environmental, social, and governance (ESG) issues.

44.    Without variations between portfolio holdings, all large-cap stock funds would own identical investment portfolios and have nearly identical investment performance. Active management offers investors the opportunity to earn superior returns through the astute selection of investments. Astute selection typically drives superior investment performance over time and distinguishes the better-performing funds from the underperforming ones. Bad asset allocation and poor investment selection generally drive long-term underperformance.

45.    Actively managed funds stand in contrast to passively managed funds, or index funds, whose objective is to replicate the holdings and investment performance of a designated benchmark index. Other than constructing a portfolio that passively tracks that of the benchmark, the investment adviser makes little, if any, investment decisions for an index fund. Compared to actively managed funds, the fees for index funds are significantly lower. Vanguard is a well-known leader in the index fund space.

**B.    Investment Aims of Large-Cap Growth Funds**

46.    The Harbor Fund is a large-cap growth fund. The stocks of the biggest companies typically dominate these funds. The principal aim of large-cap growth funds is to provide investors with long-term growth of capital.

47.    The Harbor Fund has a growth style. Funds with a growth style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields).

C.    **Investment Risks of Large-Cap Growth Funds**

48.    The principal categories of risks for the Harbor Fund include market risk, issuer risk, and the risk of investing in growth-oriented stocks.

49.    Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

50.    Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (e.g., AT&T) may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

51.    Investing in growth-oriented stocks also carries risk. Such stocks (e.g., Tesla) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., Bristol Myers).

D.    **Potential Investment Rewards of Actively Managed Large-Cap Growth Funds: Fiduciaries Select Benchmarks to Evaluate Achievement of Potential Rewards**

52.    Investments exist in a world ruled by investment performance. Typically, investors want a portfolio that consists of investments that meet or exceed their respective benchmarks. Whether an investment performs well is concrete rather than abstract.

53.    For an actively managed investment fund, the potential reward is that the fund will deliver positive investment returns that exceed those of its benchmark. Investment advisers select benchmarks that they believe have similar aims, risks, and potential rewards as those of their fund.

14

54.     Jennison selected the Russell 1000 Growth Index as the benchmark for the Harbor Fund. The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

## VII.    THE HARBOR FUND AND ITS COMPARATORS AND BENCHMARK

### A.    Harbor Fund

55.     On or before 2010, the Plan Committee selected the Harbor Capital Appreciation Fund as an investment option for the Plan. The Harbor Capital Appreciation Fund was organized as a mutual fund. In 2022, the assets in the Harbor Capital Appreciation Fund migrated to a newly formed portfolio called the Harbor Capital Appreciation Collective Investment Trust Class R. Although separate legal entities, the Harbor Capital Appreciation Collective Investment Trust Class R is a clone of the Harbor Capital Appreciation Fund. The investment teams, aims, risks, and potential rewards of each are identical, and the portfolio holdings and investment performance of each are substantially identical. From the perspective of the Plan, the move from mutual fund to collective investment trust in effect reflected a continuation of the same investment option with the same poor performance. Accordingly, throughout this complaint, Plaintiffs use the term "Harbor Fund" or the "Fund" to refer collectively to the mutual fund and collective investment trust iterations of the fund.

56.     The Harbor Fund's aim is to seek long-term growth of capital.

57.    The Harbor Fund is managed by Jennison's Large Cap Growth team.

58.    The Fund pursues its aim by investing primarily in equity securities, emphasizing common and preferred stocks of U.S. companies with market capitalizations of at least $1 billion at the time of purchase and that Jennison considers to have above-average prospects for growth. Jennison may include in the Harbor Fund any stock within the U.S. large-cap growth universe.

59.    Jennison has designated the Russell 1000 Growth Index as the Fund's benchmark.

60.    Morningstar classifies the Harbor Fund as a large-cap growth fund.

61.    Currently, approximately 95% of the Fund's portfolio is invested in large-cap stocks, and 58% is invested in growth-oriented stocks. The remainder is invested in cash and cash equivalents.

62.    The Harbor Fund's potential rewards are that it will generate positive investment returns that outperform its benchmark index. The Harbor Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. Morningstar identifies the Harbor Fund as having a very aggressive risk profile, with a portfolio risk score of 79 out of 100.

63.    The Harbor Fund is hardly the only large-cap growth fund on the market with the same mix of aims, risks, and potential rewards as described above. As set forth below, numerous substantially similar funds have existed throughout the Class Period.

### i.    Comparator 1: Fidelity Blue Chip Growth Fund

64.    The Fidelity Blue Chip Growth Fund (the "Fidelity Fund") has similar aims, risks, and potential rewards to those of the Harbor Fund.

65.    Like the Harbor Fund, the Fidelity Fund is an actively managed large-cap growth fund.

66.    The Fidelity Fund's aim is to seek capital appreciation. The Fidelity Fund pursues its aim by investing primarily in common stocks of companies that have above-average growth potential and normally invests at least 80% of its assets in blue-chip companies—companies that are well-known, well-established, and well-capitalized—which generally have large or medium market capitalizations.

67.    Like the Harbor Fund, the Fidelity Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

68.    Morningstar classifies the Fidelity Fund as a large-cap growth fund. Currently, approximately 84% of the Fidelity Fund's portfolio is invested in large-cap stocks, and 46% is invested in growth-oriented stocks. The remainder is invested in bonds, cash, and cash equivalents.

69.    The Fidelity Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Fidelity Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. Morningstar identifies the Fidelity Fund as having a very aggressive risk profile, with a portfolio risk score of 83 out of 100.

70.    The aims, risks, and potential rewards of the Fidelity Fund are similar to those of the Harbor Fund given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the Fidelity Fund a meaningful comparator to the Harbor Fund.

ii.    **Comparator 2: JPMCB Large Cap Growth Fund**

71.    The JPMCB Large Cap Growth Fund (the "JPMorgan Fund") has similar aims, risks, and potential rewards to those of the Harbor Fund.

72.    Like the Harbor Fund, the JPMorgan Fund is an actively managed large-cap growth fund.

73.    The JPMorgan Fund's aim is to seek long-term capital appreciation. The JPMorgan Fund pursues its aim by investing primarily in equity securities of large-capitalization companies whose market capitalizations are similar to those within the universe of the Russell 1000 Growth Index. The JPMorgan Fund typically invests in stocks of companies that are deemed to have a potential to exceed market expectations for a prolonged period of time.

74.    Like the Harbor Fund, the Fidelity Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

75.    Morningstar classifies the JPMorgan Fund as a large-cap growth fund. Currently, approximately 92% of the JPMorgan Fund's portfolio is invested in large-cap stocks, and 45% is invested in growth-oriented stocks. The remainder is invested in cash and cash equivalents.

76.    The JPMorgan Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The JPMorgan Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. Morningstar identifies the JPMorgan Fund as having an aggressive risk profile, with a portfolio risk score of 73 out of 100.

77.    The aims, risks, and potential rewards of the JPMorgan Fund are similar to those of the Harbor Fund given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the JPMorgan Fund a meaningful comparator to the Harbor Fund.

iii.    **Comparator 3: Putnam Large Cap Growth Fund**

78.    The Putnam Large Cap Growth Fund (the "Putnam Fund") has similar aims, risks, and potential rewards to those of the Harbor Fund.

79.    Like the Harbor Fund, the Putnam Fund is an actively managed large-cap growth fund.

80.    The aim of the Putnam Fund is to generate long-term capital growth in excess of its benchmark index. The Putnam Fund pursues its aim, under normal circumstances, by investing at least 80% of its net assets in companies of a size similar to those in the Russell 1000 Growth Index, mainly in common stocks of large U.S. Companies with a focus on growth stocks.

81.    Like the Harbor Fund, the Putnam Fund identifies the Russell 1000 Growth Index as one of its benchmarks.

82.    Morningstar classifies the Putnam Fund as a large-cap growth fund. Currently, approximately 96% of the Putnam Fund's portfolio is invested in large-cap stocks, and 43% is invested in growth-oriented stocks. The remainder is invested in cash and cash equivalents.

83.    The Putnam Fund's potential rewards are that the fund will generate positive investment returns that outperform its benchmark index. The Putnam Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. Morningstar identifies the Putnam Fund's risk profile as aggressive, with a portfolio risk score of 78 out of 100.

84.    The aims, risks, and potential rewards of the Putnam Fund are similar to those of the Harbor Fund given the similarities in the two funds' investment strategies and the types of stocks the two funds own. Moreover, both funds are actively managed investment options that

seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the Putnam Fund a meaningful comparator to the Harbor Fund.

      iv.      **Comparator 4: Vanguard Russell 1000 Growth Index Fund**

85.     The Vanguard Russell 1000 Growth Index Fund (the "Vanguard Fund") is a passively managed index fund that seeks to track the performance of a benchmark index that measures the investment return of large-capitalization growth stocks in the United States (i.e., the Russell 1000 Growth Index). The Vanguard Fund attempts to replicate the Russell 1000 Growth Index by investing all, or substantially all, of its assets in the stocks that make up the Index, holding each stock in approximately the same proportion as its weighting in the Index.

86.     Currently, approximately 89% of the Vanguard Fund's portfolio is invested in large-cap stocks, and approximately 37% is invested in growth-oriented stocks. The remainder is invested in cash and cash equivalents.

87.     The Vanguard Fund's potential rewards are that it will generate investment returns in line with the Russell 1000 Growth Index. The Vanguard Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) investing in growth-oriented stocks. Morningstar identifies the Vanguard Fund's risk profile as aggressive, with a portfolio risk score of 78 out of 100.

88.     By virtue of the similarities in their respective market capitalizations, the Vanguard Fund and the Harbor Fund share similar aims, rewards, and levels of risk. This makes the Vanguard Fund a meaningful Comparator for the Harbor Fund. Indeed, by disclosing the Russell 1000 Growth Index to the public as the appropriate benchmark for the Harbor Fund, Jennison necessarily concludes that the Russell 1000 Growth Index shares similar aims, risks, and rewards as the Harbor Fund. The Vanguard Fund shares those aims, risks, and rewards, as it is designed to mirror the composition and performance of the Russell 1000 Growth Index.

89.    The most telling difference between the Harbor Fund and the Vanguard Fund comes from the fees. As shown in the table below, the fees of the Vanguard Fund are significantly less than those of the Harbor Fund, but as illustrated in Section VIII below, the Vanguard Fund handily outperforms the Harbor Fund.

| Fund Name | Fees |
|---|---|
| Harbor Capital Appreciation Fund (Plan option pre-2022) | 64 bps |
| Harbor Capital Appreciation CIT Class R (Plan option post-2022) | 35 bps |
| The Vanguard Russell 1000 Growth Index | 1 bps[3] |

### v.    Comparator 5: BlackRock Russell 1000® Growth Fund

90.    The BlackRock Russell 1000® Growth Fund (the "BlackRock Fund") is a passively managed index fund that seeks to track the results of an index composed of large- and mid-capitalization U.S. equities that exhibit growth characteristics. The BlackRock Fund attempts to replicate the Russell 1000 Growth Index by investing all, or substantially all, of its assets in the stocks that make up the Index, holding each stock in approximately the same proportion as its weighting in the Index.

---

[3] The Vanguard Russell 1000 Growth Index offers a fee schedule with fees as low as 1 bps for investments exceeding $200 million. Since the total assets of the Plan invested in the Harbor Fund exceeded $200 million from January 1, 2010, through December 31, 2024, the Vanguard Fund would have charged a fee of only 1 bps to the Plan's participants had it been used in place of the Harbor Fund.

91.    Currently, approximately 89% of the BlackRock Fund's portfolio is invested in large-cap stocks, and approximately 35% is invested in growth-oriented stocks. The remainder is invested in cash and cash equivalents.

92.    The BlackRock Fund's potential rewards are that it will generate investment returns in line with the Russell 1000 Growth Index. The BlackRock Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. Morningstar identifies the BlackRock Fund's risk profile as aggressive, with a portfolio risk score of 77 out of 100.

93.    By virtue of the similarities in their respective market capitalizations, the BlackRock Fund and the Harbor Fund share similar aims, rewards, and levels of risk. This makes the BlackRock Fund a meaningful comparator for the Harbor Fund. Indeed, by disclosing the Russell 1000 Growth Index to the public as the appropriate benchmark for the Harbor Fund, Jennison necessarily concludes that the Russell 1000 Growth Index shares similar aims, risks, and rewards as the Harbor Fund. The BlackRock Fund shares those aims, risks, and rewards, as it is designed to mirror the composition and performance of the Russell 1000 Growth Index.

### vi.    Comparator 6: Russell 1000 Growth Index

94.    Harbor Capital Advisors, Inc. has disclosed that the Harbor Fund is benchmarked to the Russell 1000 Growth Index. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies that are similar to the companies included in the Harbor Fund—those with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

95.     By virtue of the similarities in their respective market capitalizations, the Russell 1000 Growth Index and the Harbor Fund share similar aims, rewards, and levels of risk, including market risk and issuer risk. This makes the Russell 1000 Growth Index a meaningful benchmark for the Harbor Fund. Indeed, by disclosing the Russell 1000 Growth Index to the public as the appropriate benchmark for the Harbor Fund, Jennison necessarily concludes that the Russell 1000 Growth Index shares similar aims, risks, and rewards as the Harbor Fund.

## VIII.   THE HARBOR FUND UNDERPERFORMED ITS BENCHMARK AND COMPARATOR FUNDS FOR OVER A DECADE

96.     Defendants are required by law to monitor the Plan's investments and remove imprudent ones. They must perform these duties with the skill of a prudent expert.

97.     For a prudent fiduciary, investment options that, on average, underperform their benchmarks over rolling three- or five-year periods are generally candidates for removal. Upon information and belief, such guidelines are often outlined in a plan's investment policy statement.

98.     Had the Southwest Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have removed the Harbor Fund by the start of the Class Period. Indeed, by December 31, 2018, the Harbor Fund had underperformed each of the Russell 1000 Growth Index, the Fidelity Fund, the JPMorgan Fund, the Putnam Fund, the Vanguard Fund, and the BlackRock Fund ("Comparator Funds") over the preceding three-, five-, and nine-year periods.

99.     Further, a prudent fiduciary would have realized that the Harbor Fund did not warrant the fees that it was charging for active management. Even though the Harbor Fund failed to beat its benchmark, its fees were as much as sixty-four times the Vanguard Fund's fees.

100.    By early 2019, any fiduciary properly monitoring the Plan would have seen that the circumstances warranted the selection of a new option. Yet, Southwest failed to replace the Harbor Fund with any one of the many prudent alternatives available on the market.

101.    **Table 1.a** below demonstrates the underperformance of the Harbor Fund compared to its benchmark index and to the Comparator Funds for the nine-year period from January 1, 2010, through December 31, 2018. By late 2018, any prudent fiduciary would have recognized that the Harbor Fund was a terrible encumbrance to the Plan and should have been removed.

**Table 1.a**
**January 1, 2010—December 31, 2018**

| Fund | Cumulative Return | Annualized Return |
|---|---|---|
| Harbor Capital Appreciation Retirement | 192.30% | 12.66% |
| Russell 1000 Growth TR | 202.32% | 13.08% |
| *+/- Harbor Capital* | *-10.02%* | *-0.42%* |
| Fidelity Blue Chip Growth K | 229.90% | 14.18% |
| *+/- Harbor Capital* | *-37.60%* | *-1.52%* |
| JPMorgan Large Cap Growth R6 | 210.36% | 13.41% |
| *+/- Harbor Capital* | *-18.06%* | *-0.75%* |
| Putnam Large Cap Growth R6 | 205.32% | 13.20% |
| *+/- Harbor Capital* | *-13.02%* | *-0.54%* |
| The Vanguard Russell 1000 Growth Index | 202.84% | 13.10% |
| *+/- Harbor Capital* | *-10.54%* | *-0.44%* |
| BlackRock Russell 1000® Growth Fund F | 203.99% | 13.15% |
| *+/- Harbor Capital* | *-11.69%* | *-0.49%* |

102.    Yet the Defendants failed to remove the Habor Fund. And the Harbor Fund continued to perform poorly throughout the Class Period.

103.    **Table 1.b**, below, illustrates the underperformance of the Harbor Fund from January 1, 2019, through December 31, 2024, on an annual and cumulative basis relative to the Russell 1000 Growth Index and the Comparator Funds. The Harbor Fund underperformed the Russell 1000 Growth Index by nearly 25% during this period.

**Table 1.b**
**January 1, 2019—December 31, 2024**

| Fund | Annual Performance | | | | | | Cumulative Compounded Performance |
|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
| Harbor Capital Appreciation Retirement[4] | 33.39% | 54.56% | 15.74% | -37.38% | 53.44% | 31.08% | 200.53% |
| Russell 1000 Growth TR | 36.39% | 38.49% | 27.60% | -29.14% | 42.68% | 33.36% | 224.97% |
| *+/- Harbor Capital* | *-3.00%* | *16.07%* | *-11.86%* | *-8.24%* | *10.76%* | *-2.28%* | *-24.44%* |
| Fidelity Blue Chip Growth K | 33.56% | 62.38% | 22.81% | -38.40% | 55.76% | 39.80% | 257.25% |
| *+/- Harbor Capital* | *-0.17%* | *-7.82%* | *-7.07%* | *1.02%* | *-2.32%* | *-8.72%* | *-56.72%* |
| JPMorgan Large Cap Growth R6 | 39.39% | 56.42% | 18.79% | -25.21% | 34.95% | 34.17% | 250.71% |

[4] In 2022, the Plan switched from the Harbor Capital Appreciation Mutual Fund Retirement share class to the Harbor Capital Appreciation Collective Investment Trust (CIT) Class R. The annual and cumulative performance calculations shown in **Tables 1.b** and **1.c** use the Harbor Capital Appreciation Retirement mutual fund performance data up to and including 2021 and the Harbor Capital Appreciation CIT Class R for 2022 and beyond.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *+/- Harbor Capital* | *-6.00%* | *-1.86%* | *-3.05%* | *-12.17%* | *18.49%* | *-3.09%* | *-50.18%* |
| Putnam Large Cap Growth R6 | 36.90% | 38.89% | 22.95% | -30.10% | 44.71% | 33.70% | 216.20% |
| *+/- Harbor Capital* | *-3.51%* | *15.67%* | *-7.21%* | *-7.28%* | *8.73%* | *-2.62%* | *-15.67%* |
| The Vanguard Russell 1000 Growth Index | 36.41% | 38.50% | 27.61% | -29.14% | 42.74% | 33.35% | 225.21% |
| *+/- Harbor Capital* | *-3.02%* | *16.06%* | *-11.87%* | *-8.24%* | *10.70%* | *-2.27%* | *-24.68%* |
| BlackRock Russell 1000® Growth Fund F | 36.43% | 38.60% | 27.64% | -29.14% | 42.68% | 33.30% | 225.28% |
| *+/- Harbor Capital* | *-3.04%* | *15.96%* | *-11.90%* | *-8.24%* | *10.76%* | *-2.22%* | *-24.75%* |

104.    The annualized performance numbers in **Table 1.b** highlight the overall underperformance of the Harbor Fund. Though the Harbor Fund occasionally outperformed its benchmark and certain Comparator Funds, that outperformance was overshadowed by the multiple years in which the Harbor Fund underperformed its benchmark and Comparators. The magnitude of this underperformance is captured by the cumulative numbers in **Table 1.b**. Overall, the Harbor Fund remained an imprudent investment for the Plan.

105.    Together, **Tables 1.a** and **1.b** capture the depth and the breadth of the Harbor Fund's underperformance relative to meaningful benchmarks that has persisted for more than fifteen years.

106.    All the data presented in each of the above **Tables 1.a** and **1.b** was available in real time to the Southwest Defendants throughout the Class Period.

107.    Defendants' failure to remove the Harbor Fund cost Plan participants millions of dollars in retirement savings. On average, during the period from January 1, 2019, through December 31, 2024, the assets of the Harbor Fund were approximately $2.026 billion. **Table 1.c** below compares the investment growth of $2.026 billion invested in the Harbor Fund to the growth of $2.026 billion invested in each of the Comparator Funds from January 1, 2019, through December 31, 2024. As the Table shows, Participants would have substantially more dollars in retirement savings had Defendants replaced the Harbor Fund with any of the Comparator Funds or a fund that more closely matched the Russell 1000 Growth Index.

**Table 1.c**
**January 1, 2019—December 31, 2024**

| Fund Name | Compounded Performance | Annualized Performance | Growth of $2.026 Billion |
|---|---|---|---|
| Harbor Capital Appreciation Retirement[5] | 200.53% | 20.13% | $6.088 billion |
| Russell 1000 Growth TR | 224.97% | 21.70% | $6.583 billion |
| *+/- Harbor Capital* | *-24.44%* | *-1.57%* | *-$495 million* |
| Fidelity Blue Chip Growth K | 257.25% | 23.64% | $7.237 billion |
| *+/- Harbor Capital* | *-56.72%* | *-3.51%* | *-$1.229 billion* |
| JPMorgan Large Cap Growth R6 | 250.71% | 23.26% | $7.105 billion |
| *+/- Harbor Capital* | *-50.18%* | *-3.13%* | *-$1.017 billion* |
| Putnam Large Cap Growth R6.b | 216.20% | 21.15% | $6.406 billion |
| *+/- Harbor Capital* | *-15.67%* | *-1.02%* | *-$318 million* |
| The Vanguard Russell 1000 Growth Index | 225.21% | 21.72% | $6.588 billion |
| *+/- Harbor Capital* | *-24.68%* | *-1.59%* | *-$500 million* |
| BlackRock Russell 1000® Growth Fund F | 225.28% | 21.72% | $6.589 billion |
| *+/- Harbor Capital* | *-24.75%* | *-1.59%* | *-$501 million* |

[5] In 2022, the Plan switched from the Harbor Capital Appreciation Mutual Fund Retirement share class to the Harbor Capital Appreciation CIT Class R. The annual and cumulative performance calculations shown in **Tables 1.b** and **1.c** use the Harbor Capital Appreciation Retirement share class performance up to and including 2021, and the Harbor Capital CIT Class R for 2022 and beyond.

108.    The Comparator Funds listed in each of the above Tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including Southwest's Plan. Southwest would not have had to scour the market to find them.

109.    Defendants owed a fiduciary duty to remove the Harbor Fund within a reasonable time after it manifested poor performance. Yet they retained the Fund year after year, even though it consistently failed its objectives. Any prudent fiduciary would have appreciated the overall depth of the Harbor Fund's underperformance and removed it by the start of the Class Period. No prudent fiduciary would have retained the Fund, like Southwest has, throughout the Class Period.

## IX.    CLASS ACTION ALLEGATIONS

110.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). Plaintiffs Arthur Anderson and Manuel Rivera bring this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C § 1109 to protect the interests of the Plan.

111.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to a direct individual action on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of participants and beneficiaries of the Plan. Specifically, Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

>    All participants and beneficiaries of the Plan who invested in the Harbor Fund from January 28, 2019, through the date of judgment, excluding the Southwest Defendants, any of their directors, and any

officers or employees of the Southwest Defendants with responsibility for the Plan's investment or administrative function.

112.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

    a.    The Class includes thousands of members and is so large that joinder of all its members is impracticable.

    b.    There are numerous questions of law and fact common to this Class because the Southwest Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); (ii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating Plan investment options; (iii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by retaining an imprudent investment for an unreasonable amount of time; (iv) whether Plaintiffs' claims of an imprudent process require similar inquiries and proof of the claims, and therefore implicate the same set of concerns, for all proposed members of the Class; (iv) what are the losses to the Plan resulting from each breach of fiduciary duty; and (v) what Plan-wide equitable and other relief the Court should impose in light of the Southwest Defendants' breach of duties.

31

    c.   Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were Plan participants who invested in the Harbor Fund during the Class Period, and all participants in the Plan who invested in the Harbor Fund were harmed by the Southwest Defendants' misconduct.

    d.   Plaintiffs are adequate representatives of the Class because they participated in the Plan during the Class Period, invested in the Harbor Fund, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

    e.   There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

113.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Southwest Defendants in respect to the discharge of their fiduciary duties to the Plan and their personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

114.    Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Southwest Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the Class as a whole. Plaintiffs seek reformation of the Plan to include only prudent investments, which will benefit them and other Plan participants.

115.    Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

116.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class for their allegedly imprudent conduct.

117.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## CAUSES OF ACTION

### COUNT I

**Breach of Duty of Prudence by Mismanaging and Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time**
**(Violation of ERISA, 29 U.S.C. § 1104)**
**(Against All Southwest Defendants)**

118.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

119.    At all relevant times during the Class Period, the Southwest Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control

with respect to the management of the Savings Plan and its assets, and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plan, and/or were designated in the governing Plan documents as a named fiduciary within the meaning of 29 U.S.C. § 1102(a).

120.    29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

121.    Thus, under ERISA, the Southwest Defendants are responsible for evaluating and monitoring the Plan's investments on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

122.    The Southwest Defendants breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring investments. The faulty process resulted in a Plan that included a fund that suffered poor performance for well over a decade. Southwest Defendants failed to remove the Harbor Fund within a reasonable time despite historical underperformance relative to its relevant benchmark index and Comparator Funds.

123.    By failing to replace the Harbor Fund with (a) a better-performing actively managed investment option, or (b) with a cheaper and better performing passively managed investment option (such as the Vanguard or BlackRock funds identified above), the Southwest Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

124.    The Southwest Defendants' breach of fiduciary duty has substantially impaired the Plan's use, its value, and its investment performance for all Class members.

125.    As a direct and proximate result of the Southwest Defendants' breaches of fiduciary duty, the Plan has suffered millions of dollars of damages which continue to accrue and for which the Southwest Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1132(a)(2) and 1109(a).

126.    Each of the Southwest Defendants is liable to make good to the Plan any losses resulting from the aforementioned breaches and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. The Southwest Defendants are also subject to other Plan-wide equitable or remedial relief as appropriate, including an injunction and the removal of fiduciaries.

127.    Each Southwest Defendant also participated in the breach of the other Southwest Defendants, knowing that such acts were a breach, and enabled the other Southwest Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties. Each Southwest Defendant knew of the breach by the other Southwest Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Southwest Defendant is liable for any losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

## COUNT II

### Failure to Monitor
### (Against All Southwest Defendants)

128.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

129.    The Southwest Defendants had a duty to monitor the performance of each party to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the

monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

130.    To the extent any Southwest Defendants' fiduciary responsibilities were delegated to another fiduciary, the Southwest Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently, loyally, and in compliance with governing Plan documents.

131.    The Southwest Defendants breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

    b.    failing to monitor their appointees' fiduciary process;

    c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

    d.    failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

132.    Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

    a.  failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

    b.  failing to monitor their appointees' fiduciary process;

    c.  failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

    d.  failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

133.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Southwest and the other delegating fiduciaries discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Southwest Airlines Co. Retirement Savings Plan, the Southwest Airlines Co. 401(k) Plan, and the Southwest Airlines Co. ProfitSharing Plan (collectively, the "Savings Plan" or "the Plan"), and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

    i.  find and adjudge that the Southwest Defendants have breached their fiduciary duties, as described above;

    ii.  find and adjudge that the Southwest Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach of fiduciary duty, and

to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

iii.    order the Southwest Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

iv.    find and adjudge that the Southwest Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

v.    determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

vi.    order the Southwest Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C.§ 1109(a);

vii.    remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

viii.    impose surcharge against the Southwest Defendants and in favor of the Plan all amounts involved in any transactions or fiduciary breaches that were in violation of ERISA;

ix.    reform the Plan to include only prudent investments;

x.    certify the Class, appoint the Plaintiffs as class representatives, appoint Sanford Heisler Sharp McKnight, LLP as Class Counsel, and appoint Charles Field and David Tracey as lead counsel for the Class;

xi.    award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

xii.    order the Southwest Defendants to pay interest to the extent allowed by law; and

xiii.    grant such other equitable or remedial relief as the Court deems appropriate.

DATED: January 28, 2025                    Respectfully submitted,


_____
VALERIE MOSMAN
Texas Bar No. 00796127
**THE SLOAN FIRM**
3500 Maple Avenue, Suite 1200
Dallas, TX 75219
Telephone: (214) 550-3233
Facsimile: (903) 757-7574
vmosman@sloanfirm.com

CHARLES FIELD*
California Bar No. 189817
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
7911 Herschel Avenue, Suite 300
La Jolla, CA, 92037
Telephone: (619) 577-4252
Facsimile: (619) 577-4250
cfield@sanfordheisler.com

DAVID TRACEY*
New York Bar No. 5232624
SHARON KIM*
New York Bar No. 5475561
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
17 State Street, Suite 3700
New York, NY 10004
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dtracey@sanfordheisler.com
sharonkim@sanfordheisler.com

MEGAN A. RICHMOND*
California Bar No. 170753
**MEGAN A. RICHMOND, A PROFESSIONAL CORPORATION**
7911 Herschel Avenue, Suite 300
La Jolla, CA, 92037
Telephone: (800) 210-3638
Facsimile: (619) 237-3496
megan@therichmondfirm.com

*Counsel for Plaintiffs*
*\* pro hac vice forthcoming*

40